Schofield Discipline Case.

Argued April 12, 1949. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*John G. Buchanan,* Special Counsel, with him *Emory R. Kyle* and *T. McKeen Chidsey,* Attorney General, for petitioner.

*Robert T. McCracken,* with him *George G. Chandler, C. Brewster Rhoads, Marvin Comisky, W. Bradley Ward* and *Thomas D. McBride,* for respondent.

OPINION BY MR. JUSTICE LINN, May 23, 1949:

The Attorney General of the Commonwealth filed a petition praying that Lemuel B. Schofield, a member of the bar of this Court, be required to show cause why he should not be disciplined for professional misconduct while representing the defendant in the Quarter Sessions of Philadelphia, in the trial of indictments Nos. 517 and 589 October Sessions, 1948, charging violation of the Magistrates' Court Act of June 15, 1937, P. L. 1743, 42 PS Cum. Supp. 1101 et seq. A rule was granted. The

respondent appeared and answered on the merits. As there was no dispute of material fact, the case was heard on petition and answer. We have considered all the points presented in the briefs and in oral argument but shall refer only to those deemed essential to the proper disposition of the rule.

1. Jurisdiction. There is no doubt of the power [1] of this Court to disbar, suspend or otherwise appropriately discipline members of its bar; they are officers of the court admitted to office on taking the statutory oath, [2] inter alia, to behave "with all good fidelity" to the court as well as to the client. When, as in this case, the pleadings disclose no dispute of material fact, it is unnecessary to refer the record to the Board of Governance to aid the Court by finding facts and making recommendations. In any case the final disposition is by this Court: see our Rule 17(g), (h) and (i). In *Klensin v. Board of Governance of the Pennsylvania Bar*, 312 Pa. 564, 575, 168 A. 474, 478 (1933), we said, "[The Board's] function is to determine, assuming the findings of the hearing masters to be correct, whether the recommendation of the masters to us are warranted. The judicial

---

[1] The power has been exercised in the United States and England from the earliest times. *Anonymous*, 6 Mod. 187, 87 Eng. Rep. 942 (1705); *Ex Parte Brounsall*, 2 Cowper 829, 98 Eng. Rep. 1385 (1778); *The People against Smith*, 3 Caines (N. Y.) 221 (1805); *Leigh's Case*, 1 Munford (Va.) 468 (1810); *Austin's Appeal*, 5 Rawle 191 (1835); *Matter of Mills*, 1 Mich. 392 (1850); *People v. Turner*, 1 Cal. 143 (1850); *Ex parte Steinman*, 95 Pa. 220, 40 Am. Rep. 637 (1880); *Sherwood's Investigation*, 259 Pa. 254, 103 A. 42 (1918); *Hurst's Case*, 317 Pa. 217, 176 A. 427 (1935); *Montgomery County Bar Ass'n v. Rinalducci*, 329 Pa. 296, 197 A. 924 (1938).

[2] Act of April 14, 1834, P. L. 333, section 69, 17 PS 1603. Chief Justice SHARSWOOD in his lectures on Professional Ethics, page 10, states that this oath seems to have been first prescribed by the Act of Assembly August 22, 1752, 1 Sm. L. 218, (5 Statutes at Large 161, 178, Chapter 398); it appeared in the Act of March 30, 1722-23, Volume III, Statutes at Large 367, 379, Chapter 270, which was repealed and replaced by the Act of 1752.

review is at our hands, not by the Board." See also *In Re Disbarment Proceedings,* 321 Pa. 81, 101, 184 A. 59, 68 (1936). We therefore reject respondent's submission that the petition and answer be referred to our Board of Governance.

2. Violation of Oath of Office. In considering the Attorney General's charge that respondent violated his oath of office, it is necessary to refer briefly to the trial in the Quarter Sessions in which the challenged conduct occurred. The indictments charged violation by the indicted magistrate of the Magistrates' Court Act of June 15, 1937, P. L. 1743, 42 PS 1101, et seq.: (1) by granting continuances without stating in his docket a reason therefor as required by section 14 of the Act and (2) by reviewing, altering, modifying or remitting any sentence of fine or imprisonment or by altering any official decision in any case heard by him except in the presence of and with the written approval of the prosecutor as required by Section 43(a) of the Act. It was the second trial, the jury having disagreed on the first. The presiding judge and counsel for both sides were therefore familiar with the elements of the case and the probable course to be taken at the trial.

During the trial, the courtroom being crowded, respondent requested that seats be made available for character witnesses he proposed to call. The prosecution objected, at sidebar, to the relevance of character evidence and the entry into the courtroom of "a whole crowd" of witnesses if such evidence would be excluded. The judge sustained the objection stating "[I] direct that counsel shall not call these witnesses." Respondent objected to the ruling and asked "leave to call the witnesses in the presence of the jury" and make an offer to prove good reputation in their presence. The judge again ruled, "The request of counsel for the defendant is denied, and he is directed not to call the names of these witnesses, or to call them to the stand." In spite

of that admonition, the following then occurred in the presence of the jury: "MR. SCHOFIELD: [addressing the crowded courtroom said] The character witnesses who were asked to be here by the defendant are excused. Thank you all very much for coming. Thank you, Judge Bonnelly; thank you, Judge McDevitt; thank you, Judge—

"MR. ELDREDGE: If your Honor please, I think your Honor made a direction to Mr. Schofield.

"MR. SCHOFIELD: Well, if your Honor please, we have here in this courtroom three jurists, and if I can't say thank you for a Judge who has left the bench to come here for the support of a defendant, then I don't know the duties of a lawyer, sir, and I simply express my gratitude to all these prominent citizens and jurists of Philadelphia who have come in here to lend their aid to this defendant.

"THE COURT: Major, I regard your remarks as an affront to the Court.[3]

"MR. SCHOFIELD: I am sorry if your Honor regards it as an affront. It wasn't intended as an affront. Thank you, gentlemen, very much. Shall we resume, sir?

"THE COURT: Yes."

This "affront to the court," as it was characterized by the judge, was an act of insubordination; it was a violation of the respondent's duty to behave "with good fidelity" to the court; it was an unworthy effort to get before the jury a fact or facts which the learned trial judge had ruled should not be received. Respondent's persistence to get before the jury as character witnesses the names of persons holding high office after the court ordered him not to do so was disrespectful and inex-

---

[3] The presiding judge instructed the stenographer that he was misquoted in the first draft of the transcript and directed it be corrected to read "Sir, I regard your remarks as a grave affront to the court." For present purposes it is immaterial which version be accepted.

cusable. He had no right to say, after the court had ruled, ". . . We have here in this courtroom three jurists and if I can't say thank you for a judge who has left the bench to come here for the support of a defendant, then I don't know the duties of a lawyer, sir, and I simply express my gratitude to all these prominent citizens and jurists of Philadelphia who have come in here to lend their aid to this defendant." The effect was not cured by his statement "I am sorry if your Honor regards it as an affront. It wasn't intended as an affront." But he again repeated the offense by his next statement, addressed to the same witnesses, "Thank you, gentlemen, very much." There is no ambiguity about his statements. He understood the court's ruling, the manifest scope of which was that he should not bring to the attention of the jury the names of the witnesses. It is difficult to avoid the conclusion that respondent intentionally violated the express ruling of the court in its most essential implication. In such circumstances, disavowal has been considered of little avail where but one interpretation is possible.[4] Nor can the possible effect of the offense be excused by respondent's submission, in his Answer to the Attorney General's petition, in this court, that the trial judge's exclusion of character witnesses was erroneous, a point not for decision in this proceeding.

For fifty years the legal profession has had the benefit of Justice MITCHELL's well known statement in *Scouten's Appeal*, 186 Pa. 270, 279, 40 A. 481 (1898), "The bar have great liberty and high privileges in the assertion of their clients' rights as they view them, but on the other hand they have equal obligations as officers in the administration of justice, and no duty is more funda-

---

[4] *In re Woolley*, 11 Bush (74 Ky.) 95, 109-10 (1875) ; *In re Chadwick*, 109 Mich. 588, 604, 67 N. W. 1071, 1077 (1896) ; *People v. Wilson*, 64 Ill. 195, 16 Am. Rep. 528 (1872) ; *In re Matter of Sturoc*, 48 N. H. 428, 97 Am. Dec. 626 (1869).

mental, more unremitting or more imperative than that of respectful subordination to the court. The foundation of liberty under our system of government is respect for the law as officially pronounced. The counsel in any case may or may not be an abler or more learned lawyer than the judge, and it may tax his patience and his temper to submit to rulings which he regards as incorrect, but discipline and self-restraint are as necessary to the orderly administration of justice as they are to the effectiveness of an army. The decisions of the judge must be obeyed because he is the tribunal appointed to decide, and the bar should at all times be the foremost in rendering respectful submission." See remarks of Justice BLACK *in Williamson's Case,* 26 Pa. 9, 21, 67 Am. Dec. 374 (1855) ; *Fisher v. Pace,* 336 U. S. 155, 69 S. Ct. 425, 93 L. Ed. 435; *U. S. v. United Mine Workers,* 330 U. S. 258, 291, et seq., 67 S. Ct. 677, 91 L. Ed. 884 (1947) ; *Gompers v. Bucks Stove & Range Co.,* 221 U. S. 418, 450, 31 S. Ct. 492, 55 L. Ed. 797 (1911) ; *Howat et al. v. Kansas,* 258 U. S. 181, 189-90, 42 S. Ct. 277, 66 L. Ed. 550 (1922). It is immaterial, in disposing of the case now before us, whether respondent thought the learned trial judge erred in excluding [5] the character witnesses. The court not only had the power to rule on the objection interposed by the Commonwealth but it was the court's duty to decide. The case is therefore not like cases that have been referred to in argument, in which attachment for contempt was denied for disregard of orders which the court had no power to make; see for example, *Com. v. Sage,* 160 Pa. 399, 28 A. 863 (1894) ; *Com. v. Perkins,* 124 Pa. 36, 48, 16 A. 525 (1889) ; *Rose Child Dependency Case,* 161 Pa. Superior Ct. 204,

---

[5] The learned judge said, "In my view, as this is a case not involving evil or corrupt intent, character evidence is irrelevant and immaterial to any issue in the case, and for that reason I sustain the objection to the offer, and direct that counsel shall not call these witnesses."

54 A. 2d 297 (1947); *In Matter of Rossiter*, 84 Pa. Superior Ct. 193 (1924). The judge alone has the duty of ruling on the admission of evidence; counsel's fidelity to the court requires respectful submission to the ruling; evasion is misconduct. Proper judicial procedure would be impossible if counsel and not the judge were permitted to determine the conduct of a trial. For error in the ruling, counsel had the right to review on appeal. Ex parte revision by defiance of the ruling cannot be tolerated.

3. Our Rules of Civil Procedure. Respondent's duty also required him to observe and comply with the Rules of Civil Procedure adopted by this Court pursuant to the Act of June 21, 1937, P. L. 1982, section 1, 17 PS 61. These rules have the force of statute and we must assume respondent's familiarity with them. Rule 205 provides, "The canons [6] of ethics of the American Bar Association as from time to time existing, shall be and become standards of conduct for attorneys of the court. . . ." While those canons are declaratory of standards theretofore prevailing in this Commonwealth, their formal incorporation into our rules of civil procedure shows their importance. They provide, among other rules: "A lawyer should not offer evidence, which he knows the Court should reject, in order to get the same before the jury by argument for its admissibility, nor should he address to the Judge arguments upon any point not properly calling for determination by him. Neither should he introduce into an argument, addressed to the court, remarks or statements intended to influence the jury or bystanders.

"These and all kindred practices are unprofessional and unworthy of an officer of the law charged, as is the

---

[6] Attention was called to these canons in *Re Disbarment Proceedings*, 321 Pa. 81, 95, 184 A. 59, 65 (1936), and in *Goldberg's Case*, 321 Pa. 109, 110, 184 A. 74, 75 (1936). Also see remarks of Judge SOPER, *In re Ades*, 6 Fed. Supp. (D. C. Md.) 467 (1934).

lawyer, with the duty of aiding in the administration of justice." [7]

Illustrations of punishment for professional misconduct of the same general character are common. In *Baur v. Betz,* 1 How. Pr. N. S. (N. Y.) 344 (1885), an order of court directed an attorney to disclose the whereabouts of his client to opposing counsel to enable service of a copy of an injunction. The responsive disclosure of his client's whereabouts was misleading. At page 347 the court said, "As an officer of the court he was bound to deal with it in all respects without reserve, and to obey its orders implicitly unless appealed from and reversed on appeal." The court held that costs and expenses were properly imposed on the attorney and his client.

In *State of Minnesota v. Leftwich,* 41 Minn. 42, 44, 42 N. W. 598, 599 (1889), the court ruled that certain questions were improper. Counsel persisted in "making offers substantially similar to those made" and excluded, with the apparent intent of evading the court's rulings "or with some other than a *bona fide* purpose to fairly present the cause of his client." After warning he was held in contempt which was affirmed on appeal. The Supreme Court of Minnesota said, "A counsel trying the cause of his client has, of course, rights as the representative of a suitor and as an officer of the court which must be respected; but those rights can never extend to disregarding or disobeying the rulings and orders of the court. If that were permitted the trial of a cause might become a mere farce. If he thinks a ruling against him is erroneous, he can do his duty to and save the rights of his client by taking an exception. That is the only orderly and proper way to avoid the effect of an erroneous ruling. To permit the counsel,

---

[7] Canon 22 of the Canons of Ethics of the American Bar Association.

after the court has decided that a question or a particular course of examination is improper, to persist in renewing substantially the same question, or in continuing that course, would incur the danger of the trial becoming a contest of endurance between the court endeavoring to prevent a course of examination that it deemed improper and the counsel endeavoring to follow such a course, notwithstanding the ruling of the court. A counsel who would intentionally attempt such a mode of conducting a trial, especially after being warned by the court to desist, and that it would consider persistence in it a contempt, would undoubtedly be guilty of a contempt. . . . The relator, having presented the question of his right to follow that course, and got a ruling upon it, ought, if he deemed the ruling erroneous, to have taken his exception, and afterwards conformed to the course indicated by the ruling. He had no right to attempt to evade it. As to that it is immaterial whether the ruling was or was not erroneous."

In *Territory v. Clancy et al.*, 7 N. M. 580, 37 P. 1108 (1894) an attorney was suspended for 12 months and imprisoned for 30 days for advising his client to disregard an order of the court which he thought was not binding.

In *re Gluck*, 243 N. Y. S. 334, 299 App. Div. 490 (1930) an attorney was disbarred for, inter alia, deliberately disobeying a stay order of the court. The court said, at page 344, "In his capacity as an officer of the court, respondent has proven himself incapable of a proper appreciation of his duty to uphold the mandate of the court, and, on the contrary, has demonstrated that he considers such mandate a proper subject for contemptuous treatment."

In *Russell v. French*, 67 Iowa 102, 24 N. W. 741 (1885) after a dispute between counsel as to whether a witness had already answered a question propounded and objected to, the trial judge ruled that the objection was sustained. The attorney then stated in loud tones

and insulting manner, "She has not answered the question." The court said, "When the court made the ruling it did, whether right or wrong, the plaintiff should either have submitted thereto, taken an exception, and had the error, if it was one, corrected on appeal, or in respectful language and manner addressed the court and asked to have the ruling reconsidered; but if the court declined to hear him, the plaintiff should have acquiesced therein. The time for argument is before the decision. Counsel then have the right to insist on being heard. When a decision has been made, the time for argument has passed, unless permission of the court is asked and obtained. . . . If the plaintiff believed the statement made by the court to be incorrect, and he deemed it material for the interest of his client to have it corrected, and the decision changed, he should, in respectful language, have called attention to what he deemed to be the mistake. It is quite apparent that he did not do this, but that, at least, he sprang to his feet and, in unequivocal language, directly contradicted what the court said." The punishment for contempt was reversed on procedural grounds.

In *Rubin v. State,* 192 Wis. 1, 211 N. W. 926 (1927) after the court excluded a question, a colloquy between the court and counsel followed during which counsel excepted to the ruling. Immediately thereafter counsel, looking in the direction of the jury, "under guise of an exception" said "I take exception to this undue interference with my cross-examination." In sustaining punishment for contempt, the court held that the remarks were unjustified and improper, saying, "when the court rules upon questions before it, it is the duty of counsel to respectfully acquiesce in such rulings."

*In Re Mindes,* 88 N. J. L. 117, 95 A. 743 (1915), counsel was held in contempt for disobeying the court's ruling and persisting in disobeying it. When the court ruled and expressed a desire to hear no further argu-

ment, "it was the appellant's duty to accept the ruling of the court as final, and if he desired to challenge its legal correctness to do so by an appeal . . ." See also *Holman v. State,* 105 Ind. 513, 5 N. E. 556 (1886); *Mahoney v. State,* 33 Ind. App. 655, 72 N. E. 151, 104 Am. St. Rep. 276 (1904); *Dodge v. State,* 140 Ind. 284, 39 N.E. 745 (1895); *People ex rel. Chanler v. Newburger,* 98 App. Div. 92, 90 N. Y. S. 740 (1904). Compare *People ex rel. Bernstein v. LaFetra,* 171 App. Div. 269, 157 N. Y. S. 386 (1916); *Platnauer v. Superior Court,* 32 Cal. App. 463, 163 Pac. 237 (1917); *In re Shortridge,* 5 Cal. App. 371, 90 Pac. 478 (1907).[8]

We must therefore conclude that respondent was guilty of professional misconduct in proceeding in defiance of the decision of the learned trial judge in the circumstances stated.

4. Not a Contempt Proceeding. We may refer briefly to respondent's submission that for misconduct during the trial he was subject to punishment for contempt and that the trial judge did not proceed against him, and that, for some reason which has not been made clear to us, respondent should not now be punished for misbehavior in office. We are considering respondent's violation of his oath of office—to "behave [himself] in the

---

[8] In this connection, it may not be without interest to refer to a local incident in the Philadelphia courts: *In Re James H. Heverein,* 32 Legal Intelligencer (Phila.) 188 (1875) counsel, inter alia, upon the court's refusal to adjourn to enable him to prepare a reply to commonwealth's counsel said, "Then, if you will not give me time, I will not speak unless my legal rights are sustained." Judge BRIGGS for the court of Quarter Sessions said, "If the respondent had conceived that his client was aggrieved by the rulings of the court, instead of losing his temper he should have submitted to the rulings, and, after the trial, reviewed them upon motion for a new trial or in the Supreme Court. He should have steadily kept before him that it was the duty of the court to decide every question raised by the learned counsel on either side, according to the court's best judgment of the law. . . ."

214

office of attorney, within this court, according to the best of [his] ability, and with all good fidelity, as well to the court as to the client; . . ." We are not considering whether the trial judge in the Quarter Sessions might have tried him for contempt. The present disciplinary proceeding is for a different offense, as courts have recognized: "The power of the court to punish summarily for contempt, by fine and imprisonment, is one thing, and its power to strike an attorney from the roll is another and distinct thing, though the misconduct for which an attorney may be disbarred, may in some instances, involve a contempt of court." *Beene v. State,* 22 Ark. 149, 151 (1860); *In re Adriaans,* 17 App. Cas. (D. C.) 39 (1900); *In re Pryor,* 18 Kans. 72, 26 Am. Rep. 747 (1877). In *Ex Parte Bradley,* 7 Wall 364, 19 L. Ed. 214 (1868) it was held that on a rule to show cause why an attorney should not be punished for contempt the court cannot disbar the respondent for alleged misbehavior in his office of attorney—that they are separate and distinct offenses. *Ex Parte Robinson,* 19 Wall 505, 22 L. Ed. 205 (1873). Our own cases recognize the distinction: *Sherwood's Investigation,* 259 Pa. 254, 258, 103 A. 42 (1918); *Hurst's Case,* 317 Pa. 217, 176 A. 427 (1935).

The fact that professional misconduct may also be a contempt does not bring disciplinary proceedings within the rule that one court will not punish for contempt of another tribunal.[9] The respondent is not now charged with contempt of court but with misbehavior in his office of attorney. The non-action of the trial judge does not require this Court to dismiss the Attorney General's

[9] An appellate court may take original jurisdiction of a charge of professional misconduct by its officer in a trial court or before a judge: *In re Whitehead,* 28 Ch. Div. 614 (1885); *People v. Green,* 7 Colo. 237, 3 Pac. 65, 49 Am. Rep. 351 (1883); *Ex Parte Brown,* 1 How. (Miss.) 303 (1836); *In re Thatcher,* 80 Ohio St. 492, 89 N. E. 39 (1909); *In re O———,* 73 Wisc. 602, 621 (1889).

complaint. A contempt proceeding for misbehavior in court is designed to vindicate the authority of the court; on the other hand the object of a disciplinary proceeding is to deal with the fitness of the court's officer to continue in that office, to preserve and protect the court and the public from the official ministration of persons unfit or unworthy to hold such office. *Chernoff's Case,* 344 Pa. 527, 26 A. 2d 335 (1942) ; *Moyerman's Case,* 312 Pa. 555, 167 A. 579 (1933) ; *Wolfe's Disbarment,* 288 Pa. 331, 135 A. 732, 50 A. L. R. 380 (1927) ; *Barach's Case,* 279 Pa. 89, 123 A. 727 (1924) ; *In re Oliensis,* 26 Pa. Dist. 853 (1917) ; *Ex Parte Wall,* 107 U. S. 265, 2 S. Ct. 569, 27 L. Ed. 552 (1882) ; 7 C. J. S., Attorney and Client, Section 28. Compare *Stone v. Board of Governance,* 312 Pa. 576, 168 A. 473 (1933). It is because this distinction is well recognized that we find it unnecessary to discuss that part of the record stating what followed immediately after the retirement of the jury to deliberate upon its verdict. It appears that the deputy attorney general then called attention to the trial judge's reference to respondent's "affront to the court" on the day before; that respondent replied at some length and suggested "that inasmuch as this case is not over and may require further action on the part of defense counsel, especially if the jury would want any further instructions, that any further proceedings along those lines should naturally be postponed until after the verdict in this case. If, however, Your Honor thinks otherwise, I shall be glad to proceed." The learned trial judge replied, "Gentlemen, I will give this matter consideration." On the same day the jury returned a verdict of not guilty. The Attorney General, in his petition to this Court alleges that on the day following the verdict, his deputy presented, ex parte, to the trial judge in chambers a "Memorandum for the Court Concerning the Attorney General's Motion to Have Lemuel B. Schofield, Esquire, adjudged in Contempt." He avers that after

216

reading the paper the judge replied "that he believed his power to take any action had expired with the recording of the verdict of 'Not Guilty' and that he could not take any action in the matter." He also avers that the judge authorized him to express the judge's view of the matter to the Supreme Court. In his answer the respondent replied that he was not advised of the proceeding so taken in the court below and challenged their efficacy for any purpose in the present case. In the circumstances, we have not given them any effect in coming to our conclusion on the main question.

5. Duty of the Jury in Criminal Trials. We come now to the other serious charge made against the respondent, which, briefly stated, is that, in his speeches to the jury, he said that the members of the jury were judges of the law as well as the facts and, accordingly, had the *right* to disregard the trial judge's instructions on the law, and made numerous statements challenging the law as stated and interpreted by the presiding judge. In this court, counsel for the parties differed as to the meaning of respondent's opening and closing speeches to the jury and also, if we understand them correctly, as to the law defining the duty of the jury in criminal cases and particularly in this case as urged by respondent. In finding respondent guilty of breach of his obligation to the court and misbehavior in office, we have not taken into account this charge based on his speeches to the jury. We do this because it is apparent from respondent's answer that he was under some misapprehension of the present authority of *Kane v. Commonwealth,* 89 Pa. 522 (1879). We have, however, considered the general rule and now intend, in the words of Justice MITCHELL in his concurring opinion in *Commonwealth v. McManus,* 143 Pa. 64 (1891), at page 86, to "put an end once for all to a doctrine that [we] regard as unsound in every point of view, historical, logical, or technical." These speeches are in the record. There is no

dispute of fact as to what respondent said; it is the
duty of this court to determine the effect of the words
in the circumstances. As we understand them, they con-
vict the respondent of attempting to persuade the jury
that they had the right to disregard the trial judge's
instructions on the law. While much has been written
on this subject [10] we have found no better statement of
the rule that juries are not judges of the law than Justice
MITCHELL'S in the *McManus* case from which we quote:
"The notion is of modern growth, and arises undoubtedly
from a perversion of the history and results of the cele-
brated contest over the right to return a general verdict,
especially in cases of libel, which ended in Fox's Bill,
32 Geo. III, c. 60.

"In the early days of jury trials, issues that went
to the country were usually simple, and were probably
submitted to the jury without much separation of law
and fact by the judge, and in that sense juries decided
the law. But the distinction between questions of law
and fact, and the tribunals for their decision respectively,
lies at the foundation of our juridical system, and there
was no time when it did not exist. The rule, ad ques-

[10] See Dennis: *Maryland's Antique Constitutional Thorn*, 92 U. of
P. Law Rev. 34 (1943) ; Thayer: *Preliminary Treatise*, Chap. 5, p.
183 et seq.; Howe: *Juries as Judges of Criminal Law*, 52 Harv. Law
Rev. 582 (1939) ; *Sparf v. U. S.*, 156 U. S. 51, 15 S. Ct. 273, 39 L. Ed.
343 (1894) ; *State v. Croteau*, 23 Vt. 14 (1849) overruled in *State v.
Burpee*, 65 Vt. 1, 25 A. 964 (1892) ; *Com. v. Castellana*, 277 Pa. 117,
121 A. 50 (1923) ; *Com. v. Bryson*, 276 Pa. 566, 120 A. 552 (1923) ;
*Com. v. Bednorciki*, 264 Pa. 124, 107 A. 666 (1919) ; *Com. v. New*,
142 Pa. Superior Ct. 358, 16 A. 2d 437 (1940) ; *Com. v. Fahey*, 113
Pa. Superior Ct. 598, 173 A. 854 (1934) ; *Com. v. Long*, 100 Pa. Supe-
rior Ct. 150 (1930) ; *Com. v. Goldberg*, 4 Pa. Superior Ct. 142 (1897) ;
Note, 22 Canadian Bar Review 167 (1944). The Maryland Constitu-
tional Provision that in criminal cases the jury shall be the judges
of law as well as of fact is the subject of a debate reported in
39 Maryland State Bar Association Transactions, p. 71 (1934) ; see
also Henderson: The Jury as Judges of Law and Fact in Maryland,
52 Maryland State Bar Transactions 184 (1947).

tionem facti non respondent judices, ad questionem juris non respondent juratores, was an ancient maxim in the days of Coke: Coke Litt., 155a; 8 Rep. 155a; 9 Rep. 13a; . . ." After referring at some length to the debates in the convention in which our constitution of 1790 was adopted, he continued: "It is impossible to read these various steps in the formulation of our fundamental law, without seeing that there was never at any time the intention to make or to consider juries as in any sense judges of the law. No such possible construction seems to have been apprehended until suggested by McKean, [in the convention] and the practically unanimous vote on his motion to add 'under the direction of the court as in other cases,' shows the feeling of the convention on this subject. McKean was at that time one of the foremost personages of the commonwealth, perhaps its best trained lawyer. He had studied in the Temple, and was familiar with the details of the legal controversy between Buller and Mansfield, on the one side, and Erskine, on the other, before Fox took it up as a matter of politics; and he knew, as Lewis and Wilson and Ross and Sitgreaves and Addison and Findley and other leaders of the convention knew, that the contest was not for any control by the jury as judges of the law,— even Junius hardly ventured to put his denunciations of Mansfield in that form,—but for the right of applying the law to the facts and pronouncing the result by a general verdict. And such was the understanding of the convention, as it was of parliament two years later, and such the natural meaning of the language on which they finally settled to express their purpose. It puts beyond question the right to return a general verdict, nothing more. To cut the sentence in two, and say the jury are 'to determine the law,' is not only to pervert the meaning, but to nullify the other command that they are to determine 'under the direction of the court.' What they are to determine is, 'the law and the facts as in other cases,'

that is, the law as given to them by the court, and the facts as shown by the evidence. They are bound to take the law from the court; but, so taking it, they have the right to apply it to the facts as they may find them to be proved, and to announce the result of the whole, by a general verdict of guilty or not guilty. Any other construction would be totally at variance with the fundamental principles of our system of jurisprudence and with our settled and uncontested practice. It has never been claimed that the jury are to determine what evidence is admissible, or what witnesses competent; yet, if they are judges of the law, they should decide these often most important law points in a case." At page 93 he said, "Whether the distinction between power and right be shadowy and unsubstantial in practice, or not, it is clear and vital, and I must repudiate such a confusion of logical as well as moral ideas. A jury may disregard the evidence, but no judge has ever said it had the legal right to do so; and if the disregard is of the weight of the evidence favorable to the prisoner, the court sets aside the verdict without hesitation; and even this court, though it does not pass upon the weight of evidence, does examine its sufficiency and may on that ground reverse without a new venire. [citing cases] * * * * * And in Commonwealth v. Sherry, an indictment for murder growing out of the riots of 1844, removed by certiorari from the Quarter Sessions of Philadelphia and tried in the Nisi Prius in April, 1845, Justice ROGERS charged the jury as follows: 'You are, it is true, judges in a criminal case in one sense of both law and fact; for your verdict as in civil cases, must pass on law and fact together. If you acquit, you interpose a final bar to a second prosecution. . . . The popular impression is that this power . . . arises from a right on the jury's part to decide the law as well as the facts, according to their own sense of right. But it arises from no such thing. It rests upon a fundamental principle of the common law that no man can

twice be put in jeopardy for the same offence. . . . It is important for you to keep this distinction in mind, remembering that, while you have the physical power by an acquittal to discharge a defendant from further prosecution, you have no moral power to do so against the law laid down by the court. The sanctity of your conclusions, in case of an acquittal, arises, not from any inherent dominion on your part over the law, but from the principle that no man shall be twice put in jeopardy for the same offence, a principle that attaches equal sanctity to an acquittal produced by a blunder of the clerk, or an error of the attorney general. . . . You will see, from these considerations, the great importance of the preservation, in criminal as well as in civil cases, of the maxim that the law belongs to the court, and the facts to the jury. My duty is therefore to charge you, that while you will in this case form your own judgment of the facts, you will receive the law as it is given to you by the court:' Wharton on Homicide, App., 721. To the same effect, though less explicitly developed, are the rulings by SERGEANT, J., of this court in Commonwealth v. Van Sickle, Brightly, 73; and by GIBSON, C. J., in Commonwealth v. Harman, 4 Pa. 269. * * * * * The idea of a difference in the rights and functions of juries in civil and criminal cases, as to the determination of the law, arose from a misconception of the controversy over the right to give a general verdict, and was an error for which there is no respectable English authority, and which the best American authorities have overwhelmingly disapproved." The language used by Chief Justice SHARSWOOD in the opinion in *Kane v. Commonwealth,* 89 Pa. 522 (1879) was, as Justice MITCHELL observed, "less guarded than was usual with that eminent jurist" and was based on *State v. Croteau,* 23 Vt. 14 (1849), a decision overruled in *State v. Burpee,* 65 Vt. 1, 25 A. 964 (1892). We all agree in disapproving the erroneous expressions on this subject in *Kane v. Commonwealth.*

Counsel may not argue to the jury that in exercising their power to render a general verdict they have the right to ignore the instructions on the law given by the trial judge and if such argument is made, it is the duty of the trial judge promptly to stop it.

6. Conduct During Trial. The 17th Canon of Professional Ethics provides, inter alia, that "all personalities between counsel should be scrupulously avoided . . ." Counsel on both sides during the trial in the Quarter Sessions violated the rule. In the circumstances of this case we shall not attempt to say who was the aggressor or otherwise to fix the blame. The learned trial judge's admonition addressed to both should have been sufficient warning: "Mr. Eldredge and Mr. Schofield you are both officers of the court." We impose no penalty on this charge against respondent.

7. We are unanimous in our conclusion that respondent's insubordination, described above, constituted violation of his oath of office requiring punishment. The rule must therefore be made absolute. It is therefore ordered that respondent, Lemuel B. Schofield, appear for public reprimand and censure at the bar of this Court at the opening of its session on June 24, 1949.

### REPRIMAND ADMINISTERED BY THE SUPREME COURT OF PENNSYLVANIA

MR. CHIEF JUSTICE MAXEY, June 24, 1949:

Lemuel B. Schofield: The Attorney General of Pennsylvania, the State's highest law officer, charged you in this Court with violating the oath which you took upon your admission to the bar of this Court "to behave yourself in the office of attorney with all good fidelity to the court". Your answer to this charge we adjudged to be insufficient.

The charge was a grave one and it merited and received the unanimous condemnation of this Court for

your conduct set a pernicious example. We decided and declared that your "insubordination constituted a violation of your oath of office and required punishment". We ordered that you be publicly reprimanded and condemned at the bar of this Court.

We trust this case will be the last of its kind which this Court will ever have to act upon. Pennsylvania lawyers possess a well-earned reputation not only for ability but also for that decorum which is the hallmark of character. The members of this Court are pleased to bear witness that nearly all of the members of our bar contribute substantially to that priceless reputation. Any lawyer deficient in fidelity to the court is equally deficient in fidelity to the bar, for the bar is jealous of its good repute and vigilant in preserving it.

It is ordered that this reprimand be published in the official records of this Court in the state reports as supplementary to the adjudication filed by this Court in this case on May 23, 1949.